IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

JAMES WILLIAM BAILEY, IV,       )
                                )
        Petitioner,             )
                                )
    v.                          )    CASE NO. 1:13-cv-7-ECM
                                )            [WO]
TROY PATTERSON, *et al.*,        )
                                )
        Respondents.            )

## MEMORANDUM OPINION and ORDER

## I. INTRODUCTION

In November 2008, a Henry County, Alabama jury convicted James William Bailey, IV ("Bailey") of the 2004 murder of C.J. Hatfield, based on a theory of complicity. Bailey was sentenced to life imprisonment without the possibility of parole. In 2013, Bailey brought this habeas corpus action pursuant to 28 U.S.C. § 2254 seeking to vacate his conviction and sentence. In July 2016, this Court stayed the case (doc. 59) so that Bailey could exhaust his state court remedies with respect to his claims of actual innocence and prosecutorial misconduct based on newly discovered evidence; the case was stayed for approximately eight years. In his amended petition (the operative petition), Bailey claims that alleged constitutional violations impacted his trial, and he also claims that he is actually innocent. (Doc. 93). The Magistrate Judge entered a Recommendation that Bailey's amended petition be denied without an evidentiary hearing. (Doc. 102). Bailey timely filed objections to the Recommendation. (Doc. 103).

After carefully reviewing the Magistrate Judge's Recommendation, Bailey's objections, and the entire record, the Court finds that Bailey's objections are due to be sustained in part, overruled in part, and overruled as moot in part, that the Magistrate Judge's Recommendation is due to be adopted as modified, and that Bailey's amended petition is due to be denied. The Court will, however, grant a certificate of appealability on the issue of whether Bailey made a showing of actual innocence sufficient to excuse the procedural default of his constitutional claims.

## II.  STANDARD OF REVIEW

When a party objects to a Magistrate Judge's Report and Recommendation, the district court must review the disputed portions *de novo*. 28 U.S.C. § 636(b)(1); *see also United States v. Raddatz*, 447 U.S. 667, 674 (1980). The district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge[,] . . . receive further evidence[,] or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1). *De novo* review requires that the district court independently consider factual issues based on the record. *Jeffrey S. by Ernest S. v. State Bd. of Educ. of State of Ga.*, 896 F.2d 507, 513 (11th Cir. 1990). However, objections to the Magistrate Judge's Report and Recommendation must be sufficiently specific in order to warrant *de novo* review. *See LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988) ("Whenever any party files a timely and specific objection to a finding of fact by a magistrate [judge], the district court has an obligation to conduct a *de novo* review of the

record with respect to that factual issue."). Otherwise, a Report and Recommendation is reviewed for clear error. *See Macort v. Prem, Inc.*, 208 F. App'x 781, 784 (11th Cir. 2006).[1]

### III. BACKGROUND

The Magistrate Judge set forth the relevant procedural history of this case in the Recommendation, the Court adopts and incorporates it by reference here. As the Magistrate Judge explained, after Bailey's direct appeal concluded, he brought three separate proceedings in Alabama state court pursuant to Alabama Rule of Criminal Procedure 32 ("Rule 32"). The Court summarizes below the relevant facts regarding Mr. Hatfield's murder and the subsequent investigation, the evidence presented during Bailey's trial, and the claims and evidence presented during Bailey's Rule 32 proceedings.[2]

**A.    Investigation and Bailey's Trial**

Mr. Hatfield's body was discovered the morning of Saturday, March 13, 2004, in a rural part of Henry County, Alabama.[3] (Doc. 9-3 at 1–2). Mr. Hatfield had been shot three times. (*Id.* at 2). Tire tracks near Mr. Hatfield's body were traced to a vehicle owned by James Stuckey ("Stuckey"). (*Id.*). Several days after the murder, Morris Scott Mathis ("Mathis") gave the following statement to police: After the murder, Stuckey asked Mathis to sell a .38 Taurus Special pistol on Stuckey's behalf, and Mathis sold the pistol to a gun

---

[1] While the Court recognizes that *Macort* is nonprecedential, the Court finds it persuasive.

[2] The Court does not present an exhaustive summary of every fact or piece of evidence; instead, the Court summarizes the facts and evidence which are relevant to the Court's resolution of Bailey's objections and the disposition of his amended petition.

[3] Upon review of the record, it appears that Mr. Hatfield's time of death was not established.

collector. (*Id.*). The pistol contained two live rounds and three spent shell casings. (*Id.*). Stuckey later told Mathis he had shot someone. (*Id.*). Additionally, during the course of law enforcement's investigation, a box for a .38 Taurus Special was recovered from Bailey's residence.

Over the next several months, law enforcement interviewed Bailey multiple times regarding C.J. Hatfield's murder. On January 12, 2005, Allen Hendrickson ("Hendrickson"),[4] an investigator with the Henry County Sheriff's Department, interviewed Bailey regarding Mr. Hatfield's murder. (Doc. 9-3 at 2). At that time, Bailey was in custody pursuant to an arrest on drug charges. (*See* doc. 15-3 at 79–80). Bailey made a statement to Hendrickson as follows: Stuckey called Bailey the day of the murder and said he was on his way back to Alabama from Atlanta, had no money, and needed gas, and he asked Bailey to bring him gas to a certain place. (Doc. 9-3 at 2). Mr. Hatfield was with Stuckey when Stuckey called Bailey. (*Id.*). Along the way to meet Stuckey, Bailey picked up a man named Mark. (*Id.*). When Bailey and Mark arrived where Stuckey and Mr. Hatfield were, Mark got out of the vehicle Bailey was driving and walked toward Stuckey and Mr. Hatfield; Bailey stayed in the car. (*Id.*). Bailey then heard gunshots. (*Id.*). Bailey looked to where Mr. Hatfield had been standing and did not see him. (*Id.*). Mark returned to Bailey's vehicle and told Bailey to drive away. (*Id.*). Bailey relayed that Mr. Hatfield was shot after Mr. Hatfield discovered that Stuckey was having an affair with Mr. Hatfield's girlfriend. (*Id.* at 3). Bailey insisted he did not know before the shooting that

---

[4] In the state court record, Hendrickson's first name occasionally is spelled "Alan," and other times is spelled "Allen." As best the Court can discern, the correct spelling is "Allen."

there was any plan to shoot Mr. Hatfield, and that Mark threatened to kill him if he told anyone about it. (*Id.* at 2–3). In a subsequent interview, Bailey recanted and claimed he was in Florida around the time of the murder. (*See* doc. 15-3 at 115–16). Bailey's January 12, 2005 statement to Hendrickson was video-recorded and played to the jury at Bailey's trial. (Doc. 15-2 at 166–67).

Tommy Merritt ("Merritt"), an agent with the Alabama Bureau of Investigation, testified at Bailey's trial as follows. Merritt investigated Mr. Hatfield's murder, and on March 13, 2004, he visited the scene where Mr. Hatfield's body was discovered. (Doc. 15-3 at 6). Merritt and Hendrickson interviewed Bailey in January 2005, and Bailey drew a map of the crime scene that was "very similar" to the scene Merritt saw on March 13, 2004. (*Id.* at 7–8). Bailey pointed out where Stuckey's truck was on the roadway and the placement of Mr. Hatfield's body, and it was "very similar" to what Merritt saw at the scene on March 13. (*Id.* at 7–8). Bailey also identified a gate or fence and a road to a hunting club in "approximately the same place" Merritt had seen it. (*Id.* at 8).[5] The map Bailey drew was not offered or admitted into evidence.

Bailey testified in his own defense and called three additional witnesses: Hendrickson, Rick Rungee ("Rungee"), and Chris Alban ("Alban"). Hendrickson confirmed that he interviewed Bailey in March 2005, during which Bailey recanted his January 12, 2005 statement that he met Stuckey to give him gas, and instead claimed he was in Florida. (*See* doc. 15-3 at 115–16).

---

[5] Hendrickson also testified that Bailey drew the crime scene. (Doc. 15-2 at 174). Hendrickson did not see the original crime scene in person, only photographs. (*Id.*).

Bailey testified in relevant part as follows. The week before Mr. Hatfield's body was discovered, Bailey and Heather Lynn Brown ("Brown") drove to Florida in a GMC Envoy to see Brown's children and to visit Alban, Bailey's friend, to get tattoo work done. (Doc. 15-3 at 73–75). Bailey and Brown stayed at Alban's house. (*Id.* at 75). During the visit, Bailey took Brown to visit her children at the Florida Department of Human Resource office in Pensacola. (*Id.* at 77–78). Later, while Alban was giving Brown a tattoo, Stuckey called Bailey and said he was "in a bunch of trouble." (*Id.* at 76). Stuckey told Bailey that "C.J." was dead and Stuckey needed Bailey's help. (*Id.* at 76–77). Bailey and Brown returned to Alabama Saturday night or Sunday morning. (*Id.* at 78).

During his January 12, 2005 interview with Hendrickson, Bailey was suffering from depression; was taking two prescription medications, Vistaril and Prozac; and had not slept in two weeks. (*Id.* at 80–81). During this interview, Bailey first told Hendrickson he was in Florida with Brown around the time Mr. Hatfield's body was discovered, but after a break in the interview (which was not recorded), Bailey changed his story and falsely told Hendrickson he brought gas to Stuckey. Bailey lied about his involvement after Terry Nelson ("Nelson"), another law enforcement officer, told Bailey during the interview break that law enforcement knew Bailey was there, and they were going to charge him with murder if he did not tell them what he knew. (*Id.* at 82–83). Additionally, officers told Bailey that if he cooperated, he would not be charged and would be let out. (*Id.* at 83). Bailey denied ever bringing gas to Stuckey, and although Stuckey did call Bailey, Stuckey did not ask Bailey to bring him gas. (*Id.* at 92–93). Bailey was able to draw a map of the crime scene after Merritt and Nelson showed him pictures of the crime scene. (*Id.* at 85,

94).  The first time Bailey saw the crime scene was when Merritt and Hendrickson drove him there after he was arrested. (*Id.* at 92).  Bailey did not know the box for the .38 Taurus Special matched the make and model of the pistol Mathis sold on Stuckey's behalf. (*Id.* at 89–90).  He did not recall the gun box being at his residence but said he had told Stuckey he could store some items at Bailey's house. (*Id.* at 90).

On cross-examination, Bailey acknowledged that on March 19, 2004, approximately eight or nine months before he was arrested, he told Merritt that he learned Stuckey had killed Mr. Hatfield after he and Brown returned to Alabama, which Bailey admitted was not true. (*Id.* at 96–98).  Additionally, Bailey acknowledged that he told Merritt on March 19 that Stuckey told him about a trip to Atlanta, drugs, a setup, and a robbery; and that Stuckey said he told Mathis to "find C.J., kick his ass and break his legs" when they got back to Alabama, which Bailey did not mention during his trial testimony. (*Id.* at 99–100).  Bailey also acknowledged that he had multiple prior felony convictions. (*Id.* at 100–01).

Rungee and Alban each testified about Bailey's whereabouts around the time Mr. Hatfield's body was discovered.  Rungee, Bailey's then-roommate, testified as follows. Bailey and Brown left Alabama on Friday, March 12, and they did not return until Sunday or Monday. (*Id.* at 51–53).  It was Rungee's understanding that Bailey and Brown were traveling to Pensacola, Florida, to see Brown's children, and then to see Bailey's friend "Chris." (*Id.* at 53).  Rungee also recalled that Bailey and Brown left in an Envoy. (*Id.* at 53).  Alban, Bailey's friend, testified as follows.  Bailey and Brown visited Alban at his home in Navarre, Florida, around the time Mr. Hatfield's body was discovered. (*Id.* at 61–

63).  Bailey and Brown stayed with Alban several nights, arriving in Florida on a Tuesday

or Wednesday and leaving to return to Alabama on Saturday night. (*Id.* at 63).  Alban "did

a tattoo" on Brown on Saturday, and then Bailey and Brown "got a phone call and some

stuff happened that they had to get back." (*Id.* at 63).

In charging the jury, the trial court explained that the State was "proceeding under

a theory of complicity" and explained the applicable elements for complicity liability. (*Id.*

at 144–47).  The trial court stated in relevant part:  "A person is legally accountable for the

behavior of another person constituting a crime if[,] with intent to promote or assist the

commission of the crime[,] he aids or abets such other person in committing the crime."

(*Id.* at 144).  The trial court further stated:

> The mere [presence] of a person at the time and place of a crime is not
> sufficient to justify his conviction for the commission of a crime.  However,
> if presence at the time and place a crime is committed in conjunction with
> other facts and circumstances tends to connect the accused with the
> commission of the crime, then the jury may find the accused guilty.
> Presence, companionship and conduct before and after the offense are
> circumstances from which one's participation in the criminal intent may be
> inferred.

(*Id.* at 145).  The jury found Bailey guilty of murder (*id.* at 156; doc. 98-1 at 47 (verdict

form)), and the trial court sentenced him to life imprisonment without the possibility of

parole as a habitual felony offender (doc. 15-3 at 182; doc. 98-1 at 48 (sentencing order)).

The Alabama Court of Criminal Appeals ("ACCA") affirmed. (Doc. 9-3).

## B.    First Rule 32 Petition

After his direct appeal concluded, Bailey initiated his first of three Rule 32 petitions.[6]  In his first Rule 32 petition, Bailey claimed that the prosecution withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and also that newly discovered evidence—including the testimony of Stuckey,[7] the shooter—established Bailey's innocence. (Doc. 9-7 (Rule 32 petition), doc. 9-8 (amended Rule 32 petition), doc. 9-9 (order denying Rule 32 petition)).  The Rule 32 court held an evidentiary hearing (*see* doc. 26-1 (transcript)), at which Bailey's counsel orally moved to amend the petition to add a claim of ineffective assistance of counsel (*id.* at 6–7).  At the evidentiary hearing, Stuckey testified that he shot Mr. Hatfield, no one else was present when the shooting took place, and Bailey did not assist him in any way related to Mr. Hatfield's murder. (*Id.* at 68–70; *see also* doc. 9-9 at 2).  Additionally, the Rule 32 court heard evidence that after Bailey's trial, another codefendant, John Edward Parmer ("Parmer"), pleaded guilty to manslaughter in connection with C.J. Hatfield's death. (Doc. 9-9 at 3–4).  At the plea hearing, Parmer's attorney presented the following factual basis:  Parmer was "present when Mr. Hatfield was shot by others," and Parmer then "transported the body to a scene where it was found the next day." (Doc. 26-2 at 8 (plea hearing transcript)).[8]  The Rule 32 court denied Bailey's claim of newly discovered evidence as "unreliable,"

---

[6] The judge who presided over Bailey's trial also presided over Bailey's three Rule 32 petitions.

[7] Stuckey pleaded guilty to murdering Mr. Hatfield after Bailey's trial. (*See* doc. 9-8 at 1–2, 5; doc. 26-1 at 68).  Stuckey went to trial and was convicted, and he pleaded guilty before his sentencing. (Doc. 26-1 at 68).

[8] A different judge presided over Parmer's case. (*See* doc. 26-2).

observing that the statements by the codefendants (Bailey, Stuckey, and Parmer) were inconsistent with one another. (Doc. 9-9 at 3). The court also denied Bailey's ineffective assistance claim, reasoning that those claims were raised on direct appeal and rejected by the ACCA. (*Id.* at 4). The court did not address the *Brady* claim. The ACCA affirmed, concluding that Bailey had waived his *Brady* and ineffective assistance claims (doc. 9-11 at 2–3), and that the Rule 32 court did not abuse its discretion in denying relief based on newly discovered evidence of innocence (*id.* at 6–8).

## C.    Second Rule 32 Petition

On August 23, 2016, Bailey filed his second Rule 32 petition, raising several claims. (Doc. 93-3 at 2). The Rule 32 court summarily dismissed all of the claims except for the claim that Bailey had newly discovered evidence which proved his innocence. (Doc. 93-5 at 5).[9] The court held an evidentiary hearing on the newly discovered evidence claim, in which Bailey presented evidence of alleged police and prosecutorial misconduct. (*See* doc. 93-3; doc. 98-1 at 128–57 (excerpts of transcripts of Rule 32 evidentiary hearing)). In particular, Bailey presented evidence of a transcript of an alleged interview between Hendrickson and Brown which took place on November 22, 2004. During this alleged interview, Hendrickson and Brown hatched a plan for Brown to "set up" Bailey on drug charges with the ultimate goal of law enforcement pressuring Bailey into assisting them with their investigation into Mr. Hatfield's murder. (*See generally* doc. 93-10 (transcript)). According to Hendrickson and Brown's alleged plan, Brown would manufacture drugs at

---

[9] The Court is unable to discern from the record what other claims were brought in Bailey's second Rule 32 petition.

her and Bailey's shared home and then tip off law enforcement so they could arrest Bailey for drug possession. (*See generally id*).

At the evidentiary hearing before the Rule 32 court, Lindsay Norton McDaniel ("McDaniel"), a former Henry County Sheriff's Office employee, testified that she transcribed this alleged interview between Hendrickson and Brown and opined that it seemed like Bailey was being set up. (Doc. 93-3 at 5 (Rule 32 court's order)).[10] Hendrickson denied the statements in the transcript and said he never asked Brown to frame Bailey, although he did ask Brown for help in getting Bailey to talk to him. (*Id.* at 5–6). The State presented evidence that no payment record existed for McDaniel's preparation of a transcript of Hendrickson's alleged interview of Brown, and the parties stipulated that no payment record existed. (*Id.* at 6). William White, Brown's former attorney, had never seen the disputed transcript, and if he had, it would have changed his approach in representing Brown, who was facing drug charges at the time. (*Id.* at 8). According to Brown's testimony, investigators did not threaten her to frame Bailey. (Doc. 98-3 at 34). Moreover, Brown gave inconsistent statements to the FBI about the November 2004 interview with Hendrickson: she first denied that Hendrickson had ever asked her to plant drugs on Bailey and claimed that the disputed transcript was fabricated, and she later recanted parts of her initial statement, claimed that the transcript was authentic and that Hendrickson did ask her to plant drugs on Bailey. (Doc. 98-1 at 172).

---

[10] The Court was unable to locate in the record a complete transcript of this evidentiary hearing; thus, the Court derives its summary of the testimony presented from the Rule 32 court's order.

Evidence was also presented of a letter allegedly written by Nereida Bundy ("Bundy"), a Henry County Assistant District Attorney ("ADA"), in which Bundy instructed Hendrickson to "retract" all evidence of the alleged November 2004 interview with Brown, to "withdraw" the interview from the official record, and to arrest Brown. (Doc. 93-11). The letter further stated that "[a]ny other course of action will be considered untenable by the District Attorneys offices of Henry and Houston Counties." (*Id.*). At the hearing, Bundy stated the letter is a fabrication and she never directed anyone not to hand over a transcript to the defense. (Doc. 93-3 at 6).

The Rule 32 court denied Bailey's petition, finding the new evidence[11] not credible for several reasons. The court noted that witnesses disputed the authenticity of both the transcript and the letter, and that no pay record existed for the November 2004 interview transcript even though pay records existed for other transcripts McDaniel had prepared. (Doc. 93-3 at 7–8). The court also highlighted Brown's statement to the FBI that she had never had a conversation with Hendrickson about planting drugs on Bailey, that Brown was a fugitive from justice who had been convicted of trafficking, and that Brown's then-attorney did not know about the transcript. (*Id.* at 8). The court also observed that another state circuit court had tried a Rule 32 proceeding brought by Bailey involving the same evidence, and that court found the Bundy letter "incredulous." (*Id.* at 9). The court reasoned that it "ma[de] no sense that an investigator and lawyer would put their careers

---

[11] The court explained that Bailey's attorney did not show that the evidence was newly discovered, but that the court was aware of one of Bailey's other collateral proceedings before a different court in which Bailey's mother testified that she discovered the files "years later." (Doc. 93-3 at 7, n.2).

on the line, let alone, do so in writing as part of the record." (*Id.*).  The court pointed out that Bailey was convicted of murder based on his own statement placing him at the scene, a .38 Taurus Special gun box found at his residence, and his drawing of the crime scene which was similar to the actual crime scene. (*Id.*).  The ACCA affirmed. (Doc. 93-5).

**D.    Third Rule 32 Petition**

On July 29, 2020, Bailey filed his third Rule 32 petition, once again claiming he had newly discovered evidence which demonstrated his actual innocence. (Doc. 98-1 at 7–13).  On September 1, 2021, the Rule 32 court held an evidentiary hearing at which Bailey offered alibi testimony from Brown and Denise Aue-Webb ("Aue-Webb"). (Doc. 93-1 at 1; doc. 98-3 at 1–63 (hearing transcript)).  Brown testified in relevant part as follows.  She and Bailey travelled to Florida on Wednesday, March 10, 2004, so she could have supervised visitation with her children. (Doc. 98-3 at 5, 17).  On Friday, March 12, Bailey drove Brown to a location in downtown Pensacola for her supervised visitation. (*Id.* at 7).  Bailey dropped her off for the visitation and picked her back up at the end. (*Id.* at 7–8).  On Friday evening, she and Bailey went out to eat and went to a couple of nightclubs, and then they spent the night at Bailey's friend Chris's trailer. (*Id.* at 12).  On Saturday, March 13, she and Bailey left to return to Alabama at around 9:00 p.m. (*Id.* at 16).  Brown acknowledged that she left Alabama in 2006 and did not tell her sister or her children where she was. (*Id.* at 10).  She moved to Canada, then to Washington, and then to Georgia. (*Id.* at 11).

On cross-examination, Brown acknowledged that she was a convicted felon and that when she lived in Canada, she used two false names. (*Id.* at 20–21).  She also acknowledged

that while she was in Welcome County, Washington, she had a conversation with Bailey in which he told her, "There are some holes you have to fill in on some things that are kind of difficult." (*Id.* at 22). She further testified on cross-examination as follows. On Saturday, March 12, while she and Bailey were on their way back to Alabama, Stuckey called Brown's phone and spoke to Bailey. (*Id.* at 23–24). While Bailey and Stuckey were speaking, Bailey's demeanor changed from "happy and joking" to "very quiet and very reserved." (*Id.* at 24). Moreover, Bailey was not "always truthful" and "manipulates." (*Id.* at 27). In response to the court's questions, Brown testified that when Stuckey and Bailey spoke on the phone, Bailey said, "Yes, I will meet you there" before hanging up the phone. (*Id.* at 34). Brown further testified that Hendrickson "never outright threatened [her], that [she] can recall at this moment in time." (*Id.*).

Next, Aue-Webb testified as follows. She had worked in Florida for Familiesfirst Network, a community-based care agency under contract with the Department of Children and Families, for twenty years, including in March 2004. (*Id.* at 38, 43–44). She reviewed her notes from March 12, 2004, which reflected that she supervised Brown's visitation with her children that day. (*Id.* at 41, 43). According to Aue-Webb's notes, Brown's visitation began at 1:56 p.m. and ended at 4:50 p.m. (*Id.* at 40; doc. 98-1 at 18). Aue-Webb's notes were admitted into evidence. (*See* doc. 98-1 at 18–19). The visitation stood out to Aue-Webb because it was "the first time a mother actually brought birthday presents" for her children. (Doc. 98-3 at 41). Brown arrived in a car driven by a man, but Aue-Webb did not remember who he was. (*Id.*). Aue-Webb told the man he could not participate in the

visitation because he was not a parent, and he said he understood. (*Id.* at 42). The man was driving a light colored "SUV type of car." (*Id.*).

On June 17, 2022, the Rule 32 court denied Bailey's third Rule 32 petition. (Doc. 93-1). The court acknowledged that if all of Bailey's Rule 32 petitions had been presented together, Bailey "perhaps . . . would have had a stronger case." (*Id.* at 7). But the court concluded that the evidence in Bailey's third Rule 32 petition was not "newly discovered" because it was known at the time of trial. (*Id.* at 8). The court further reasoned that Aue-Webb was available at trial, and that while Brown was unavailable at trial because she was a fugitive from justice, Bailey's trial could not have been delayed "for fifteen years or until such time as Heather Brown was captured." (*Id.*). The court further reasoned that Bailey had presented alibi evidence at trial, and while Brown's and Aue-Webb's testimonies "would make the alibi defense stronger, [they] [do] not prove actual innocence." (*Id.* at 8–9). The ACCA affirmed the denial of Bailey's third Rule 32 petition. (Doc. 98-7).

## IV. DISCUSSION

In his amended § 2254 petition before this Court, Bailey asserts three grounds for relief. In Ground One, Bailey asserts a "WONG SUNG violation,"[12] alleging that he was on strong medications given to him by the Houston County Jail when he made his one incriminating statement that he brought gas to Stuckey at the crime scene. (Doc. 93 at 6). In support, Bailey alleges that he was "set up" on drug charges by Brown so that Hendrickson could re-question him about Mr. Hatfield's murder, that investigators knew

---

[12] Bailey did not provide a case citation, and the Court cannot determine the case to which he may be referring. This omission had no impact on the Court's analysis or conclusion.

Bailey was with Brown in Florida during the relevant time period, and that Bailey's incriminating statement was involuntary because Houston County Jail officials had given him medication two days before he made the statement. (*Id.*). Ground Two is a claim of prosecutorial misconduct and "withholding of exculpatory material of [a] set up." (*Id.* at 8). In support, Bailey references the alleged November 22, 2004 interview between Hendrickson and Brown in which they conspired to set Bailey up with drugs and have him arrested, as well as the alleged letter in which ADA Bundy directed Hendrickson to remove the transcript from the file. (*Id.*). In Ground Three, Bailey asserts "Actual Innocence – Fundamental Miscarriage of Justice." (*Id.* at 9). In support, he alleges that the only evidence showing he could have had anything to do with Mr. Hatfield's murder was his own statement that he was in Alabama and took gas to aid the true killer, Stuckey, and the evidence of the empty Taurus gun box allegedly found at Bailey's residence. (*Id.*). He further alleges that Merritt testified at Stuckey's trial that the Taurus gun box was actually found in Stuckey's truck. (*Id.*). Additionally, Bailey references the alibi testimony provided by Brown and Aue-Webb. (*Id.* at 10).

The Magistrate Judge recommends that Bailey's amended petition be denied in its entirety. (Doc. 102). The Magistrate Judge concluded that Grounds One and Two are procedurally defaulted because Bailey failed to adequately exhaust the claims in state court, and that state court rules prohibit him from exhausting the claims now. Further, the Magistrate Judge construed Ground Three as raising a claim of actual innocence pursuant to *Schlup v. Delo*, 513 U.S. 298 (1995), as a gateway to excuse the procedural bars prohibiting the Court's review of the merits of Grounds One and Two; and as a freestanding

16

actual innocence claim pursuant to *Herrera v. Collins*, 506 U.S. 390 (1993). The Magistrate Judge concluded that Bailey failed to demonstrate actual innocence sufficient to satisfy the *Schlup* gateway standard, and that a freestanding innocence claim is not available to Bailey because such claims are not viable in non-capital cases.

Bailey raises twelve enumerated objections to the Recommendation. Based on the issues raised in the Objections, the Court will not address them in the order in which Bailey presented them. For example, many of the objections—Objections 3, 4, 5, 6, 8, 9 10, and 12—relate to the Recommendation's findings and conclusions regarding actual innocence. The Court will first address Objections 1, 2, and 7; then, the Court will address Objections 3, 4, 5, 6, 8, 9 10, and 12; finally, the Court will address Objection 11.

## A.    Objection 1

In "Factual Objection 1," Bailey objects to purported "facts" set forth in the Recommendation on page 3—specifically, the Recommendation's description of Bailey's third Rule 32 petition centering on testimony given by Brown and Aue-Webb, "a witness to the presence of Brown and a man in Florida around the time of the murder"—on the grounds that the "man in Florida" is Bailey. Upon *de novo* review, the Court concludes that the Recommendation's description of this portion of the procedural history of Bailey's case is accurate and does not constitute a factual finding as to whether or not Bailey is the "man in Florida" about whom Aue-Webb testified. Consequently, this objection is due to be overruled.

**B.     Objection 2**

The section labeled "Factual/Legal Objection 2" contains more than one objection. Bailey first objects to the Recommendation's conclusion that Claims One and Two are unexhausted and procedurally defaulted and "therefore, should not be used to factually show innocence of murder." (Doc. 103 at 6).   To the extent Bailey contends that the Magistrate Judge, in evaluating Bailey's actual innocence claim, did not consider the facts underlying Claims One and Two because the claims were unexhausted, the record does not support this contention.   In any event, the Court has reviewed Bailey's actual innocence claim *de novo* and has considered all the evidence, and as explained further below, the Court concludes that he has not shown actual innocence.   Thus, this objection is due to be overruled.

Bailey also objects to the conclusion that Claims One and Two are unexhausted because, according to him, exhaustion would have been futile.   In support of this argument, Bailey cites violations of his counsel's civil rights in October 2016 when she traveled to Henry County for a hearing.   First, Bailey cites no authority for the proposition that futility supplies an exception to § 2254's exhaustion requirement; indeed, precedent suggests the opposite. *See Sundar v. I.N.S.*, 328 F.3d 1320, 1325 (11th Cir. 2003) (explaining that the United States Supreme Court's decision in *Engle v. Isaac*, 456 U.S. 107, 130 (1982), "establishes that perceived futility is no exception to the exhaustion requirement contained in 28 U.S.C. § 2254"), *abrogated in part on other grounds by Santos-Zacaria v. Garland*, 598 U.S. 411, 413, 419 (2023).   Additionally, with respect to Claim One, Bailey does not explain, and it is not apparent to the Court, how events from October 2016 have any bearing

on Bailey's (different) counsel's failure to raise the involuntary confession argument in November 2009 in his petition for writ of certiorari on direct appeal. (*See* doc. 9-5 at 1–13). Therefore, this objection is due to be overruled.

## C.    Objection 7

In "Factual/Legal Objection 7," Bailey objects to the Recommendation's purported failure to consider his sufficiency of the evidence claim. (Doc. 103 at 13). He contends that his amended habeas petition incorporated his prior habeas petition, which included the claim of insufficient evidence. He provides no record citation for this proposition, and the Court's review of his amended habeas petition discerns no language incorporating his prior petition by reference. Additionally, in the Court's July 12, 2024 Order granting Bailey's motion for leave to amend/supplement his petition, the Court specifically advised Bailey that "the amended petition will supersede the initial petition, and this case will proceed only on the claim(s) presented and against the defendant(s) named therein." (Doc. 92). Consequently, Objection 7 is due to be overruled.

## D.    Objections Relating to Actual Innocence—Objections 3, 4, 5, 6, 8, 9, 10, and 12

Objections 3, 4, 5, 6, 8, 9, 10, and 12 are various objections to the Recommendation's findings and conclusions regarding Bailey's attempt to show actual innocence. Objections 3 and 5 are objections to the Recommendation's findings that Bailey's proffered new evidence of police/prosecutorial misconduct and Brown's testimony, respectively, are not credible. In Objection 4, Bailey objects to the Recommendation's finding that Bailey presented an alibi at trial. Objection 6 is an objection to the Recommendation's conclusion that Bailey cannot pursue a freestanding

actual innocence claim under *Herrera* because, based on Eleventh Circuit precedent, such relief is not available in non-capital cases.    Objection 8 is an objection to the Recommendation's conclusion that Bailey has not satisfied the *Schlup* standard.    In Objection 9, Bailey objects to the Recommendation's "reliance on a gun box to find he is not actually innocent." (Doc. 103 at 15).    Objection 10 is an objection to the Recommendation's failure to "find that Bailey's conviction resulted in a decision based on an unreasonable determination of the facts given the evidence presented in the state court proceedings." (*Id.* at 16).    Finally, Objection 12 is an objection to the Recommendation's finding that certain of Bailey's proffered new evidence is not "new" under *Schlup* either because the evidence was not newly discovered, was cumulative, or both.

Because the resolution of Objection 12 informs the Court's resolution of some of the remaining objections and the Court's *de novo* review of Bailey's actual innocence claim under *Schlup*, the Court addresses Objection 12 before the others.    To begin, the Court lays out the general principles applicable to a *Schlup* actual innocence gateway claim.

To "balance the societal interests in finality, comity, and conservation of scarce judicial resources with the individual interest in justice that arises in the extraordinary case," the Supreme Court established a miscarriage-of-justice exception, arising from a prisoner's factual innocence, to excuse a federal habeas petitioner's procedural default of a claim in federal court. *Schlup*, 513 U.S. at 324.    The *Schlup* Court reiterated that "'[i]n appropriate cases,' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Id.* at 320–21 (quoting *Murray v. Carrier*, 477 U.S. 478, 495 (1986)).

*Schlup* formulated a specific rule to implement this general principle. It held that a prisoner asserting innocence as a gateway to reach the merits of defaulted claims must establish that, in light of new, reliable evidence, "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.* at 327. This rule "ensures that petitioner's case is truly 'extraordinary,' while still providing petitioner a meaningful avenue by which to avoid a manifest injustice." *Id.* (quoting *McCleskey v. Zant*, 499 U.S. 467, 494 (1991)).

A gateway innocence claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. "A petitioner's burden . . . is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006). The Supreme Court elaborated that "a petition supported by a convincing *Schlup* gateway showing 'raise[s] sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error'; hence, 'a review of the merits of the constitutional claims' is justified." *Id.* at 537 (alterations in original) (quoting *Schlup*, 513 U.S. at 317). Although a habeas petitioner asserting actual innocence to overcome a procedural bar need not make an *absolute* showing of innocence, *id.* at 538, this miscarriage-of-justice exception is "rare" and applies only in an "extraordinary case," *Schlup*, 513 U.S. at 321.

### 1.  Objection 12:  Whether Bailey Has Proffered "New" Evidence

In Objection 12, Bailey objects to the Recommendation's finding that his proffered new evidence was not "new" for purposes of the *Schlup* gateway because the evidence was only newly available and not newly discovered.  He contends that, when evaluating an actual innocence claim, the Court should consider new evidence regardless of whether it is newly available or newly discovered.  He also objects to the Recommendation's finding that some of his evidence was not "new"—in particular, the alibi testimonies of Brown and Aue-Webb—because the evidence was cumulative of what was presented at trial.

The Eleventh Circuit has declined to resolve the question of whether evidence is "new" for *Schlup* purposes if the evidence is "newly discovered" or instead merely "newly presented." *See Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1151 n.132 (11th Cir. 2022) (also observing that other circuits are split on this question).  In this Court's view, evidence is "new" in the *Schlup* context if it was "not presented at trial" because that is how the Supreme Court has described it. *See Schlup*, 513 U.S. at 324 (explaining that, "[t]o be credible, [an actual innocence] claim requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial"); *House*, 547 U.S. at 537 (repeating this statement).  The Court's conclusion is further informed by the Supreme Court's admonition that courts evaluating a *Schlup* actual innocence gateway claim must consider "'*all* the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House*, 547 U.S. at 537–38

(emphasis added) (quoting *Schlup*, 513 U.S. at 327–28). Then, "[b]ased on this total record," the habeas court "must make 'a probabilistic determination about what reasonable, properly instructed jurors would do.'" *Id.* at 538 (quoting *Schlup*, 513 U.S. at 329). Additionally, the Court's conclusion is underscored by the miscarriage-of-justice exception's purpose, which is to "correct[] a fundamentally unjust incarceration." *Schlup*, 513 U.S. at 320–21 (quoting *Murray*, 477 U.S. at 495). The Court finds persuasive the Seventh Circuit's reasoning that "a requirement that new evidence be unknown to the defense at the time of trial would operate as a roadblock to the actual innocence gateway." *Gomez v. Jaimet*, 350 F.3d 673, 680 (7th Cir. 2003). The Court also agrees that "[t]he burden for proving actual innocence in gateway cases is sufficiently stringent[,] and it would be inappropriate and unnecessary to develop an additional threshold requirement that was not sanctioned by the Supreme Court." *Id.*

To be sure, the timing of the habeas petition is a factor bearing on the reliability of the new evidence purporting to show actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013); *see also id.* at 399 ("Unexplained delay in presenting new evidence bears on the determination whether the petitioner has made the requisite showing."); *Schlup*, 513 U.S. at 332 ("[T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."). And if the new exculpatory evidence is merely cumulative of what was presented at trial, it may not be sufficient for the petitioner to satisfy the *Schlup* standard. *See, e.g.*, *Rozzelle v. Sec'y, Fla. Dep't of Corr.*, 672 F.3d 1000, 1017 (11th Cir. 2012) (concluding that habeas petitioner did not satisfy *Schlup* because his new evidence was "largely cumulative of what

the jury heard"). But based on precedent, evidence that was not presented at trial is "new" for *Schlup* purposes, even if it could have been discovered earlier and even if it is cumulative—although, again, the evidence still may not be sufficiently *reliable* or *probative* for those reasons. Thus, Bailey's objections are due to be sustained to the extent that the Recommendation concluded that Bailey's evidence was not "new" because it was not newly discovered or because it was cumulative, and the Court declines to adopt these portions of the Recommendation.

### 2. Objection 4: Whether Bailey Presented an Alibi at Trial

In Objection 4, Bailey objects to the Recommendation's finding that he presented an alibi at trial, asserting that Alban's and Rungee's respective testimony at trial about Bailey's whereabouts was not sufficiently conclusive and that the trial court did not instruct the jury about the alibi defense. Upon *de novo* review, the Court concludes that Bailey presented evidence of an alibi at his trial; that the jury was not specifically instructed about an alibi defense does not change this conclusion. Moreover, that he presented an alibi at trial does not, by itself, prevent the Court from concluding that he has presented new alibi evidence under *Schlup*. Accordingly, Objection 4 is due to be overruled.

### 3. Objections 3, 5, 8, and 9: *Schlup* Findings

As indicated above, Objection 8 is an objection to the Recommendation's conclusion that Bailey has not satisfied the *Schlup* standard, and Objections 3, 5, and 9 are objections to findings related to whether Bailey has satisfied the *Schlup* standard. Specifically, Objection 3 is an objection to the Recommendation's findings that Bailey's new evidence of prosecutorial and police misconduct was not credible, and Objection 5 is

an objection to the Recommendation's finding that Brown is not credible. In Objection 9, Bailey objects to the Recommendation's "reliance on a gun box to find he is not actually innocent." (Doc. 103 at 15).

The Court first addresses whether Bailey's new evidence is reliable for *Schlup* purposes. *See Schlup*, 513 U.S. at 324 (explaining that a gateway innocence claim requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial"). His new evidence, which was not presented at trial, includes: Brown's and Aue-Webb's testimonies; the different stories told by Bailey's codefendants, including Stuckey's testimony that he acted alone in shooting Mr. Hatfield and Bailey was not involved, and Parmer's statement to another judge that Mr. Hatfield was shot in one location and then transported to the rural area where his body was found; Merritt's testimony during Stuckey's trial that the .38 Taurus Special gun box was recovered from *Stuckey's* truck;[13] and evidence of alleged police and prosecutorial misconduct, including the alleged transcript of the November 2004 interview between Hendrickson and Brown regarding the plan to "set" Bailey up, McDaniel's testimony that she transcribed the interview, and the alleged letter from ADA Bundy instructing Hendrickson to remove the transcript from the file.

Of the universe of new evidence, the only evidence which may be reliable is Aue-Webb's testimony that a man dropped Brown off for visitation with her children and picked

---

[13] Bailey does not proffer any evidence of Merritt's testimony from Stuckey's trial, but the Court will assume without deciding that Merritt so testified.

her back up later.  It is not apparent to the Court that Aue-Webb would have any reason to lie. *Cf. Hyman v. Brown*, 927 F.3d 639, 661 (2d Cir. 2019) (noting the district court's observation that a recanting witness had no discernible motive for falsely recanting her trial testimony and concluding that the district court did not err in finding the recantation credible).  Moreover, Aue-Webb articulated a plausible reason why Brown's visitation was memorable (it was the first time a mother brought birthday presents for her children), and her notes corroborate the date and time of the visitation.  However, the Court need not conclusively decide this question, and the Court will assume without deciding that Aue-Webb's testimony constitutes reliable evidence under *Schlup*.

The Court has carefully considered "'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" *House*, 547 U.S. at 537–38 (emphasis added) (quoting *Schlup*, 513 U.S. at 327–28).  Here, there are three main pieces of incriminating evidence:  (1) Bailey's own statement that he brought gas to Stuckey and was present when Mr. Hatfield was murdered; (2) the recovery of a .38 Taurus Special gun box from Bailey's residence, which matched the make and model of the gun Mathis sold on Stuckey's behalf (and, relatedly, Bailey's testimony that he told Stuckey he could store items at Bailey's residence); and (3) Merritt's and Hendrickson's testimonies that Bailey drew a diagram of the crime scene which was very similar to the actual crime scene.  But a fully informed jury would also hear evidence, old and new, which may reasonably be viewed as exculpatory.  This jury would hear testimony from Bailey himself and other witnesses that Bailey was in Florida both the day before and the day of the discovery of Mr. Hatfield's

body. This jury would also hear Bailey's explanation for why he made the incriminating statement to police, including his being under the influence of prescription medication and law enforcement officers' threats and promises, and his explanation that he was able to draw a diagram of the crime scene because Merritt and Nelson showed him pictures of it. Jurors would also hear that Stuckey claims to have acted alone in shooting Mr. Hatfield, and that Parmer told another judge still a different story: that Mr. Hatfield was shot in one location and then transported to the rural area where his body was ultimately found. The jury would also learn of Merritt's testimony that the .38 Taurus Special gun box was recovered from *Stuckey's* residence. They would also see the alleged transcript of the November 2004 interview between Hendrickson and Brown regarding the plan to "set" Bailey up, McDaniel's testimony that she transcribed the interview, and the alleged letter from ADA Bundy instructing Hendrickson to remove the transcript from the file. The jury, though, would also hear testimony disputing the authenticity of the transcript and the letter, and it would hear evidence casting doubt on Brown's credibility.

After carefully reviewing the record, the Court concludes that Bailey has not met his burden to show that, considering all the evidence—including Aue-Webb's new, presumptively reliable testimony—it is more likely than not that no reasonable jury would find him guilty beyond a reasonable doubt. Aue-Webb's testimony is not sufficiently probative to assist Bailey in meeting the *Schlup* standard. Aue-Webb could not identify Bailey and instead only testified that a man dropped Brown off for her visitation and picked her back up. But even if the jury inferred from Aue-Webb's testimony that Bailey is the one who transported Brown to and from the visitation, it would account for Bailey's

whereabouts for no more than four hours the day before Mr. Hatfield's body was discovered. (*See* doc. 98-3 at 40 (Aue-Webb's testimony that Brown's visitation began at 1:56 p.m. and ended up 4:50 p.m.); doc. 98-1 at 18 (Aue-Webb's notes reflecting the same)). This evidence is even less compelling given that Mr. Hatfield's time of death has not been established.

To be sure, a fully informed jury would also hear Brown's testimony that Bailey was with her in Florida from the Wednesday before Mr. Hatfield's body was discovered until late in the evening on Saturday, the day of the discovery. But the jury would also hear evidence undermining Brown's credibility.[14] Brown has made inconsistent statements about events relevant to this case, including inconsistent statements to the FBI about the alleged November 2004 interview with Hendrickson. She admittedly fled the country to avoid arrest and lived under false names for an extended time. She testified that Bailey had told her: "There are some holes you have to fill in on some things that are kind of difficult." (Doc. 98-3 at 22). She is also a convicted felon. To combat Brown's perceived lack of credibility, Bailey insists that Aue-Webb's testimony corroborates Brown's and establishes that Brown is telling the truth about Bailey being with her Florida. The Court disagrees. As just noted, Aue-Webb recalled that a man dropped Brown off for visitation and picked her back up, but Aue-Webb did not remember who the man was. Aue-Webb's testimony is corroborating (and thus exculpatory) to the extent one believes Brown's

---

[14] The Court need not, and does not, make a conclusive determination about whether Brown's new testimony is credible. Thus, Objection 5 is due to be overruled as moot. But, as explained further below, the hypothetical, fully informed jury in the *Schlup* analysis would hear and consider the substantial evidence which may impact their assessment of Brown's credibility.

testimony that *Bailey* was the man who was with her, but her testimony does not conclusively corroborate Brown's. Additionally, Brown's testimony is substantially cumulative of the testimony presented at trial—namely, Bailey's and Alban's respective testimony—which did not create reasonable doubt.

A fully informed jury would also hear significant evidence undermining the credibility of the "transcript" of the alleged November 2004 Hendrickson/Brown interview and the Bundy letter, upon which Bailey relies to show police and prosecutorial misconduct.[15] Hendrickson and Bundy dispute the authenticity of the transcript and the letter, respectively, and Brown at one point told the FBI that the alleged interview with Hendrickson had not occurred. Additionally, no pay record exists for this transcript even though pay records exist for other transcripts McDaniel had prepared. Moreover, Brown's then-attorney was unaware of the transcript. Finally, there is little evidence in the record before the Court detailing the circumstances in which Bailey discovered the transcript and the letter. For these reasons, a jury may well view Bailey's new evidence of alleged police and prosecutorial misconduct with skepticism and give it less weight than that to which Bailey says it is entitled.

On this record, the evidence about the .38 Taurus Special gun box is a wash for purposes of the *Schlup* analysis. On the one hand, evidence was presented during Bailey's

---

[15] As with Brown's testimony, the Court need not, and does not, make a conclusive determination about the credibility of Bailey's proffered evidence of police and prosecutorial misconduct. Thus, Objection 3 is due to be overruled as moot.

trial that the gun box was discovered at Bailey's residence.[16]  On the other hand, Merritt apparently testified at Stuckey's trial that the gun box was recovered from *Stuckey*'s truck. The Court cannot discern from the record an explanation for this inconsistency or other evidence which would tend to show that one version is likely more accurate.  But even if it were established that the gun box was recovered from Stuckey's truck and not Bailey's residence, it is not sufficient to assist Bailey in showing that it is more likely than not that a reasonable, fully informed jury would not convict him.[17]

Notably, the jury would also hear that three codefendants—Bailey, Stuckey, and Parmer—have offered differing factual accounts of how Mr. Hatfield was murdered, a fact which the Court finds troubling.  Bailey told police that he delivered gas to Stuckey, and that he, "Mark," and Stuckey were present when Mr. Hatfield was shot.  By contrast, Stuckey claims no one else was present and that Bailey did not assist him in any way related to the murder.  In yet a third version of events, Parmer says that Mr. Hatfield was shot in one location and then transported to the rural area where his body ultimately was found. Suffice it to say that these three stories are irreconcilable.

---

[16] Bailey also argues that the purported discovery of the .38 Taurus Special gun box at his residence is irrelevant because there is no ballistics or physical evidence establishing that a .38 Taurus Special is the murder weapon.  The Court disagrees.  While there may not be direct evidence establishing a .38 Taurus Special as the murder weapon, there is circumstantial evidence.  Mathis testified that Stuckey approached him and asked him to sell a gun—a .38 Taurus Special—on Stuckey's behalf.  The gun had three spent shell casings; Mr. Hatfield had been shot three times.  Additionally, Stuckey later told Mathis he had shot someone.  Thus, to the extent the gun box was discovered at Bailey's residence, this evidence is not irrelevant.

[17] Thus, Objection 9 is due to be overruled as moot.

Although there may be evidence which the jury might find exculpatory, there is also evidence from which a jury could (and did) find Bailey guilty as complicit in Mr. Hatfield's murder:  (1) Bailey's own statement that he brought gas to Stuckey and was present when Mr. Hatfield was shot, and (2) law enforcement's testimony that Bailey drew an accurate diagram of the crime scene.  If jurors heard all of the evidence, old and new, there is a possibility that they would have reasonable doubt about Bailey's guilt.  But a *possibility* is not enough to satisfy *Schlup*; it must be "more likely than not that no reasonable juror would have found [Bailey] guilty beyond a reasonable doubt." *See Schlup*, 513 U.S. at 327. Bailey has not met this standard.

 After careful consideration, the Court finds that Bailey has not met his burden to show that his case is one of those "extraordinary cases" warranting relief under *Schlup* based on actual innocence.  Therefore, Objection 8 is due to be overruled.

### 4.  Objection 6:  Freestanding Actual Innocence Claim

Regarding the freestanding innocence claim under *Herrera*, the Magistrate Judge concluded that Bailey is not entitled to relief as a matter of law because such relief is not available in non-capital cases.  In Objection 6, Bailey contends that this conclusion is erroneous because he was sentenced to life without parole, and Alabama law defines life without parole as a capital offense.  Thus, according to Bailey, his case is a capital case because state law defines his crime of conviction as a capital offense.

It is an open question whether "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to

process such a claim." *Herrera*, 506 U.S. at 417; *see also House*, 547 U.S. at 554 (again declining to resolve the issue).  According to Bailey, a freestanding innocence claim under *Herrera* is not foreclosed for him because his offense of conviction is "capital" under state law, even though he was not sentenced to death.  In this case, however, the Court need not resolve these questions, and the Court will assume without deciding both that a freestanding innocence claim exists and that Bailey could bring such a claim even though he was not sentenced to death.  Even assuming both preconditions are satisfied, Bailey has not demonstrated entitlement to relief.  Whatever standard would govern a freestanding innocence claim would be "extraordinarily high," *Herrera*, 506 U.S. at 417, and no doubt higher than the already demanding *Schlup* standard for excusing procedural default, *see House*, 547 U.S. at 555 (suggesting that "at the least, . . . *Herrera* requires more convincing proof of innocence than *Schlup*").  Because, for the reasons explained above, Bailey has not met the demanding *Schlup* standard, it follows that he also has not met the even more demanding (and again, hypothetical) *Herrera* standard.  Consequently, Objection 6 is overruled.

### 5. Objection 10

As indicated above, Objection 10 is an objection to the Recommendation's failure to "find that Bailey's conviction resulted in a decision based on an unreasonable determination of the facts given the evidence presented in the state court proceedings." (Doc. 103 at 16).  The Court construes this objection as another objection to the Recommendation's findings that Bailey neither satisfied the *Schlup* standard nor was entitled to relief based on a freestanding claim of actual innocence under *Herrera*.  For the

reasons explained above, the Court concludes that Bailey has not sufficiently shown actual innocence under *Schlup* or under *Herrera* (assuming a freestanding innocence claim exists). Consequently, Objection 10 is due to be overruled.

### E.    Objection 11

In "Factual/Legal Objection 11," Bailey objects to the Recommendation's failure to find a constitutional violation in Bailey's conviction. As explained above, Bailey's involuntary confession and prosecutorial/police misconduct claims were procedurally defaulted. The federal habeas court may not consider the merits of a § 2254 petitioner's procedurally defaulted claims unless the petitioner can show either (a) cause and prejudice, or (b) a fundamental miscarriage of justice, such as actual innocence. *Bailey v. Nagle*, 172 F.3d 1299, 1302, 1306 (11th Cir. 1999). As explained above, Bailey has not demonstrated cause and prejudice, nor has he shown a fundamental miscarriage of justice. Thus, Objection 11 is due to be overruled.

### V.  CERTIFICATE OF APPEALABILITY

Under AEDPA, before a petitioner may appeal the denial of a § 2254 habeas corpus petition, the petitioner must obtain a Certificate of Appealability ("COA"). *Miller-El v. Johnson*, 537 U.S. 322, 335–36 (2003); 28 U.S.C. § 2253(c)(2). Thus, this Court is required to issue or deny a COA when entering a final order, such as this one, that is adverse to a federal habeas petitioner. *See Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*. A COA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To

make such a showing, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336 (parenthetical in original) (quoting *Slack*, 529 U.S. at 484). A claim "can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that [the] petitioner will not prevail." *Id.* at 338. Moreover, when the district court rejects a prisoner's claim on procedural grounds without reaching the underlying constitutional claim, the prisoner must show that jurists of reasons could debate whether the district court's procedural ruling was correct. *See Slack*, 529 U.S. at 484–85; *Bell v. Fla. Att'y Gen.*, 614 F.3d 1230, 1231 (11th Cir. 2010).

The Court concludes that reasonable jurists could debate whether he has marshalled sufficient evidence to satisfy the *Schlup* actual innocence standard and therefore excuse the procedural default of his constitutional claims, and the issues presented are adequate to deserve encouragement to proceed further. Therefore, the Court will grant a certificate of appealability on the following issue:

> Whether Bailey made a showing of actual innocence sufficient to excuse the procedural default of the constitutional claims raised in his amended § 2254 petition.

The Court further concludes that Bailey has not demonstrated entitlement to a COA on any other claims or issues.

34

# VI.  CONCLUSION

Accordingly, upon an independent review of the record, and for good cause, it is ORDERED as follows:

1.      Bailey's objections (doc. 103) are SUSTAINED IN PART, OVERRULED IN PART, and OVERRULED AS MOOT IN PART as set out herein;

2.      The Recommendation of the Magistrate Judge (doc. 102) is ADOPTED as modified;

3.      Bailey's amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (doc. 93) is DENIED;

4.      The Court GRANTS a certificate of appealability on the issue of whether Bailey made a showing of actual innocence sufficient to excuse the procedural default of the constitutional claims raised in his amended § 2254 petition.

A separate Final Judgment will be entered.

DONE this 2nd day of March, 2026.

_____/s/ Emily C. Marks_____
EMILY C. MARKS
UNITED STATES DISTRICT JUDGE